**UNITED STATES for and on Behalf of LANEHART**

**v.**

**UNITED ENTERPRISES, Inc. et al.**

**Civ. No. 3761.**

United States District Court
W. D. Louisiana,
Lake Charles Division.

Feb. 4, 1954.

Ashton L. Stewart, Baton Rouge, La., for plaintiff.

S. W. Plauche, Jr., Plauche & Plauche, Lake Charles, La., for defendant.

DAWKINS, District Judge.

Defendant, United Enterprises, Inc. (called United), entered into a general contract with the Government to repair or remodel certain buildings at Camp Polk, Louisiana, and in turn sublet the painting to plaintiff. In this suit the latter claims a balance due him of $11,663.96. He alleges that although his original bid for the painting was $90,000, under the terms of the primary agreement, the Government had the right to increase or diminish the quantities as follows:

"SC–15–Estimated Quantities. The quantities listed below are estimates only. The contractor will be required to complete the work specified herein in accordance with the contract. The contract unit price will not be changed within the limit of 50 percent less than the estimated quantities listed below, nor within the limit of 100 per cent more than the estimated quantities listed below."

and at the end of the contract work thereunder the amount due him for painting was the sum of $93,861.53 as shown by Schedule A of the complaint. He alleges that in addition, his subcontract required him to do certain painting under the heading of "carpentry" which was not included in the lump sum contract price, amounting to $2,356.43 which he designates "Schedule B"; and for extra work according to "verbal agreement" the sum of $1,616.60; thus making an aggregate of $97,834.56 due him, upon which payments had been made totaling $86,170.60, and leaving the balance sued for.

Defendant disputed these figures and attached to its answer "Schedule A" showing the "total value of the contract" (presumably meaning plaintiff's earnings thereunder) as $87,978.82, against which it had made payments of $86,170.-60, leaving a balance due of $1,808.22.

Thus the amount alleged to be due the plaintiff of $97,834.56, less that admitted by defendant of $86,170.60, is exactly the sum sued for.

However, in his brief, his counsel lists the items of "difference between the parties" as follows:

| | | |
|---|---|---:|
| (1) | Items 173 and 174 | $3,294.00 |
| (2) | Item 143 | 3,168.00 |
| (3) | Painting under carpentry | 1,070.05 |
| (4) | Extras | 1,616.60 |
| (5) | Difference in counts on items | 333.39 |
| (6) | Difference between unit prices and total lump sum of contract, as provided in contract | 381.00 |
| | | $9,863.04 |

all of which were denied in the answer.

No. 1 above "Items 173 and 174" (bearing numbers 7213 and 1801 in the general contract) represented the breakdown for painting the inside of two buildings bearing those numbers, in the defendant's original contract with the Government for the entire job. There

was a disagreement between the plaintiff and defendant as to whether under that contract this interior painting was required. To be on the safe side it was included in the subcontract, and plaintiff's break-down valued it at $1,647 for each of the two buildings, or $3,294 for the two. The evidence reasonably established that this interior painting of these buildings would have cost about $1,500, leaving a gross profit of some $294.

The representative of the Government, whose interpretation of the original contract was conclusive, held that it did not include painting of the insides of these buildings. The total figures for all work on items 173 and 174, including whatever painting was required, shown in defendant's break-down, under its original contract with the Government, was for No. 173 "exterior and interior alterations and additions to T–1801 complete; including exterior painting of new woodwork ..$ 3,600.00 No. 174—"exterior and interior alterations and additions to T–7213, including exterior painting on new woodwork ................ 4,201.00"

Total         $ 7,801.00."

DeVillentroy, who was the representative of defendant in executing both the original contract with the Government and the subcontract for the painting with the plaintiff, testified as follows:

" 'A Mr. T. Snyder, and we had a meeting and he asked me if we had figured the interior painting of those two buildings, and I told him yes, as he could readily see by our proposal submitted and the unit price in our contract agreement, that we had figured the painting of the interior of these buildings, and thereupon, as these buildings were to be used for ladies and the bathrooms were found inadequate for ladies to use, we agreed to build the bathrooms in lieu of just placing a tub in a corner for use. In these alterations there was quite additional moneys involved, which is evidenced by the deviation from the original plan as existing, and can be found in the building, and also a slight alteration to the four nurses' quarters buildings.' "

On December 26, 1951, the Government and defendants signed "Supplemental Agreement No. 3", offered in evidence as P–8 (the original was dated June 27, 1951).

"Whereas, it is found advantageous and in the best interest of the Government to modify said contract for the following reasons:

"Twenty-one (21) contract items have been found unnecessary and were not used in the rehabilitation of hospital facilities, also the Contractor offered a credit for interior painting of Buildings No. T–1801 and T–7213 which was not required under the specifications.

"The additional work cannot be delayed incident to the time required to prepare plans and specifications and to advertise for separate bids, because with this work time is of the essence, and the above-mentioned process would excessively delay completion of the work.

"The Contractor has available the necessary equipment and labor to accomplish the work and has agreed to perform the work at a fair and reasonable price.

"Now, therefore, the contract is modified in the following particulars but in no others."

The agreement thus enumerates some 23 items by number in which decimations or reductions in "quantity units" which were decreased by a total of $4,-480.72. In this list were included items 173 and 174 as to which the Government was given a "credit on omission of interior painting" of $300 each. The supplemental agreement then recited:

"B. *Contract Costs and Quantities*

"Due to changes required by Paragraph A above, the contract costs and quantities are modified as follows:"

There follows a list of the same numbered items and deductions and the agreement concludes:

"Because of the modifications required by this Supplemental Agreement, the net amount of the contract is decreased in the amount of $4,-480.72.

"It is understood and agreed that on account of the foregoing modification of said contract, additional time will not be allowed."

As early as July 26, 1951, and before plaintiff had done any painting on items 173 and 174 (numbers T–1801 and T–7213 in the primary contract), the Resident Engineer for the Government wrote the defendant as follows:

"In answer to your verbal request of today, we advise that the interior painting of buildings 1801 and 7213 is not authorized by your contract.

"Your offer to refund to the Government $300.00 per building in lieu of painting is accepted from this level and we await your letter of proposal authorizing the above deductions. Upon receipt of your proposal we will debit your accounts with the stipulated amounts."

Defendant confirmed this agreement on August 13th of the same year, as follows:

"This will serve to confirm our verbal conversation whereas we are pleased to submit you a credit of $300.00 for the omission of painting in connection with Building No. 7213, and also a credit in the amount of $300.00 for the omission of painting in connection with Building No. 1801."

Prior thereto, that is before the exchange of the above letters between the Resident Engineer and the defendant, the latter on July 12, 1951, had written plaintiff (P–9) as follows:

"In accord with our Contract agreement, please be advised we have decided to eliminate all painting in connection with Buildings No. 1801 and 7213.

"Accordingly, you will kindly make this Unit Price deduction from our mutual Contract agreement and oblige"

Plaintiff (P–10) replied as follows:

"This is in reply to yours of July 12, 1951, and in confirmation of my verbal reply thereto heretofore given you.

"You requested in your said letter that all painting in buildings number 1801 and 7213 be eliminated from our contract. I was informed by Mr. Snyder's office that there has been no changes in plans and specifications regarding buildings number 1801 and 7213. I refuse to accede to such request. You can no more cancel that portion of the contract than you can the whole contract."

In the subcontract for painting between plaintiff and defendant, the price fixed was for "all of the painting specified under * * * 'as painting' " of the contract between defendant and the Government, and "payment" was to be made "on a unit price basis, copy of which is attached hereto and made part hereof". And it was specifically said that "painting done under 'carpentry' not included in the lump sum of contract price. Difference between unit prices and total lump sum of contract to be paid subcontractor by general contractor."

Article II of the said subcontract further provided:

"Article II. The Subcontractor agrees to be bound to the Contractor by the terms of the Agreement, Surety Bond, General Conditions, Drawings and Specifications for the entire work (which he has examined and read) insofar as they relate in any part or in any way to the work undertaken herein, and to assume

towards the Contractor, in connection with the work covered by this contract, all of the obligations and responsibilities which the Contractor by those documents assumes towards the Owners or anyone else."

Under Article III, it was further agreed:

"Article III. The work included in this contract is to be done under the direction of said Architect and his decisions as to the true construction and meaning of the drawings and specifications shall be final."

Inserted between pages 2 and 3 of this subcontract, and following Article X, are four pages listing in detail all the work to be performed. The first sheet is headed "Carpentry and Millwork", the second "Painting Continued", the third "Remodeling and/or Alterations to Bldgs." and the fourth, simply "Painting". These are followed by Article XI in which the Contractor "agrees to pay to the said Subcontractor for said labor and materials herein undertaken to be done and furnished, the sum of Ninety Thousand and no/100 Dollars * * *".

Items 173 and 174 appear on the third sheet, headed as above stated, and are the last two of the four items on that page. The first two, 171 and 172, were to be "complete, including interior painting but not including exterior rehabilitation and exterior painting"; whereas numbers 173 and 174 embraced "exterior and interior alterations and additions to building * * * complete, including *exterior painting of new woodwork.*" (Emphasis by the writer).

It is undisputed that plaintiff did no interior painting under items 173 and 174, but toward the end of the job he hurriedly painted a stairway and some other exterior, which could not exceed a value of $100 on each building. The basis for his claim to the full amount of these items is that, in making such a bid, it is commonly known and understood that a bidder will knowingly underestimate the cost of some items, while over-valuing others, but when all are considered he figures to end up with a profit. He insists that such was the situation with respect to items 173 and 174. However, the proven facts are against him for it can scarcely be denied that, had this interior painting been done, it would have cost him approximately $3,000 for the two buildings leaving a profit of about $294 on both. It was not a case of eliminating any work which he was to do under the primary contract, but a finding that it was not contemplated and had been erroneously included in the subcontract, to wit, the interior painting of these two items. He, like defendant, was bound by the interpretation of the original contract of the Government Engineer. See quotation from Article II of the subcontract above.

In Article IV of this subcontract, it was also agreed:

"Article IV. The Subcontractor hereby agrees to make any and all changes, furnish the materials and perform the work that the Contractor may require, without nullifying this Agreement, at a reasonable addition to, or deduction from, the contract price, hereinafter named, and pro rata to the same. No Alterations or Changes Shall Be Made, However, Except upon the Written Order of the Contractor. The amount to be paid by the Contractor, or allowed by the Subcontractor, by virtue of such alterations, shall be stated in such order."

██ It may also be added that, in the light of circumstances surrounding these items and their inclusion in plaintiff's bid, equity and good conscience would not justify their allowance. If plaintiff could legally insist on being paid more than $3,000 for work erroneously stipulated and which was never performed, there would be no reason why it could not be done in other instances where similar mistakes were made and thereby he would enrich himself to whatever the total might be.

It is undisputed that exterior painting was expressly included in both the pri-

mary and subcontracts for the outsides of these buildings and this justifies the allowance to plaintiff of $100 for each building.

## Item No. 143

In the list of items attached to the primary contract between defendant and the Government, under the heading of "Painting" appears No. 143 embracing "exposed new roof sheathing and rafters, estimated quantity 9,000 square feet, unit price .094" or $840; and in the subcontract the same item (No. 143) had a unit price of .12 or a total of $1,080. If this work had been done defendant would have had to pay plaintiff $240 more for this item than it would receive under its contract with the United States.

However, here again, the painting called for under this number was never done by plaintiff for it is referred to in his brief as having been "deleted from the general contract, solely as a result of the renegotiation and replacement of the porches rather than the repair of them * * *". In the exhibit attached to the primary contract, item No. 143 appears under the heading "Painting" and covers "exposed new roof sheathing and rafters" with the "estimated quantity" 9,000 square feet at .094 per foot and applied to the item of carpentry, to wit, No. 26 "roof sheathing replaced complete 9,000 board feet" and which was the same quantity as covered by No. 143, for which plaintiff in the subcontract with the defendant had priced at .12 per square foot, or a total of $1,080. In the renegotiation agreement Item No. 26, covering carpentry under the primary contract, was increased from 9,000 board feet to 19,341, and No. 27 from 230 board feet to 45,685 board feet. Defendant contends that the painting to be done under No. 143 was a duplication of that required under item 145, "screen porches—type—W—1 bldgs., 20, unit price $166.00", presumably amounting to $3,320, and in item 146, "screen porches —type W—2 and W—4 bldgs., 4, porch unit price $90.00" amounting presumably to $360.

Without attempting to review the mass of evidence offered upon the point, it is believed that item 143 was a duplication of the painting in items Nos. 145 and 146. At least plaintiff has failed to sustain the burden of proof resting upon him to prove his right to recover this item. The testimony of the Government's employees dealing with the subject, some of which was taken by plaintiff, was squarely against his contention, and on the other hand supported the position of the defendant.

## Painting Under Carpentry

The total amount claimed under this heading of $1,070.05 was made up as follows:

| "Item #4 | $7.50 |
|---|---|
| Item #5 | 6.25 |
| Item #7 | 1.60 |
| Item #12 | 21.00 |
| Item #15 | 45.10 |
| Item #18 | 252.82 |
| Item #19 | 87.00 |
| Item #20 | 127.14 |
| Item #24 | 230.00 |
| Item #29 | 291.64 |
| | $1070.05" |

Of these items, No. 4, 5, 7, 12, 15 and 24, amounting to $409.43, were admitted as being due by defendant, thus leaving items 18, 19, 20 and 29, aggregating $660.62. As to No. 18, plaintiff's counsel frankly admits in his brief, page 27, that "we do not believe the evidence supports this claim for $248.60". He also concedes that item 19 should be reduced by the sum of $33.60. Plaintiff's evidence preponderates in favor of the balance of Nos. 19 and 20. His men kept count of the lights glazed under the former and of those puttied under 20. The ex-partee settlement with the Government for less by the defendant was not binding on plaintiff, and the representative of the Government, whose decision on disputed matters was to be final, was never called in on these items.

The same conclusion applies to item No. 29—that is plaintiff's proof by records kept at the time is more reliable

than the uncertain estimates of the defendant, and the plaintiff should recover the total of $197.88 claimed. He should also have Judgment for the balance of $1,808.22, admitted by defendant to be due.

Proper decree should be presented.